**Linda POMELLA, Plaintiff,**

v.

**REGENCY COACH LINES, LTD., and Isaac Bell, Jr., Defendants.**

No. 93–CV–75459.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 6, 1995.

---

George Googasian and Steven Googasian, Googasian, Hopkins, Hohauser & Forhan, Bloomfield Hills, MI, for plaintiff.

David Anderson, Ward, Anderson & Porritt, Bloomfield Hills, MI, for defendants.

*AMENDED OPINION AND ORDER*

FEIKENS, District Judge.

## I. *INTRODUCTION*

Plaintiff, Linda Pomella, a Michigan resident, brings this diversity action against the driver of a commercial bus, Isaac Bell, formerly of Illinois[1], and its owner, Regency Coach Lines, Ltd., ("Regency"), an Illinois company, to recover for personal injuries stemming from a collision between the bus and a car in which plaintiff was a passenger. In her complaint, plaintiff alleges that defendant Bell was negligent, both under common law and the Motor Vehicle Code of Michigan, M.C.L.A. § 257.627. She alleges that he was driving recklessly, without a sharp lookout, and at a speed which was "imprudent" given road conditions. She charges Regency with imputed negligence. Defendants deny breaching any duty owed to plaintiff, and in any event, assert that any act or omission by the defendants cannot be said to have proximately caused plaintiff's injuries. They seek summary judgment.

Extensive discovery has been taken in this case, consisting primarily of eyewitness testimony, in the form of depositions, and expert testimony, presented in deposition form and in live testimony at an evidentiary hearing that was conducted on July 6, 1995. Not surprisingly, there is some disagreement among the eyewitnesses as to time, speed, and stopping distance. Among the experts, the disagreement centers on the inferences that can reasonably be drawn when any one version of the facts is taken as true.

## II. *FACTUAL BACKGROUND*

Summarizing the eyewitness accounts of the pertinent facts, it is undisputed that on January 10, 1993, the plaintiff was a passenger in a 1991 Ford Escort being driven in the left lane of westbound Interstate 94 ("I-94") by her then-boyfriend, Jeffrey Wilson. Bell was driving the Regency bus in the adjacent right lane, trailed by a line of cars. It is undisputed that precipitation had accumulated on the highway as a result of recent snowfall, and that the right lane was in somewhat better driving condition than was the left lane. It is also undisputed that Wilson lost control of the Escort at some point west of the bus, and it slid into the right lane and was struck on the passenger side by the right front corner of the bus.

At the approximate time of the accident[2], Jeffrey McQuire, a former police officer, was driving a vehicle on eastbound I-94 at an estimated rate of speed of fifty to fifty-five miles per hour. Robert Newcomb was in the passenger seat of that vehicle. Newcomb estimates that he saw the accident from about half to three-quarters of a mile away from the collision; McQuire, on the other hand, says he observed the accident scene less than 100 yards away. (*See* McQuire Deposition at 18). Loren Schneider was traveling westbound on I-94, directly behind the bus by approximately one hundred feet. (*See* Schneider Deposition at 8). Albert Gross was also traveling on westbound I-94 in the right lane, about four to five vehicles behind the bus. (*See* Gross Deposition at 9).

While it is agreed that it had been snowing at some point before the collision occurred, the witnesses disagree as to whether it was snowing at the time of the accident. Bell testified that it had stopped snowing shortly before the accident took place. (*See* Bell Deposition at 24). Loren Schneider and Robert Newcomb also indicated that the snow had temporarily ceased (*see* Schneider Deposition at 7, Newcomb Deposition at 6 and 13), but Jeffrey McQuire, Albert Gross, and Jeffrey Wilson testified that it was at least snowing lightly at the time of the accident. (*See* McQuire Deposition at 11, Gross Deposition at 10, Wilson Deposition at 39).

It is generally agreed that the surface of I-94 was slick at the time of the accident.

---

1. Mr. Bell has since moved to Indiana.

2. The accident occurred during the mid-morning hours of January 10, 1993.

Newcomb indicated that the car he was in was running into "icy conditions" and that there was "snow on the road." (*See* Newcomb Deposition at 6 and 13). McQuire also has testified that the roads were wet and icy in spots, and portions were snow-covered. (*See* McQuire Deposition at 10–11). Schneider and Wilson testified that there was an accumulation of snow on the ground, with Schneider indicating a depth of a few inches. (*See* Schneider Deposition at 20 and Wilson Deposition at 19). Wilson described I–94 as "slushy", but indicated he was not aware of any ice, although he feared his car would hit a dry patch of cement and flip when he lost control. (*See* Wilson Deposition at 20 and 49).

The road conditions in the two lanes of westbound I–94 were not uniform. The witnesses consistently testified that the right lane of westbound I–94 was in better driving condition than the left lane. (*See* Wilson Deposition at 20, Gross Deposition at 44, Newcomb Deposition at 33). A "trail" of two tire tracks was observed in the right lane. (*See* Bell Deposition at 25, Gross Deposition at 9, Schneider Deposition at 21, Wilson Deposition at 43). Bell indicated that there was ice and snow between the tracks, (*see* Bell Deposition at 25), and Schneider also testified that there was snow between the tracks. (*See* Schneider Deposition at 8). There was testimony that the snow in the right lane was "packed down" (*see* Gross Deposition at 9 and Schneider Deposition at 8) and that the left lane was piled with unplowed snow. (*See* Bell Deposition at 25 and 31, Gross Deposition at 3 and 9, Schneider Deposition at 8–9). Wilson stated that he did see tire tracks in the left lane. (*See* Wilson Deposition at 43).

Wilson originally was in the line of cars behind the bus in the right lane. Bell testified that he first noticed the car 100 to 200 feet behind the bus when it pulled into the left lane. (*See* Bell Deposition at 27). Various witnesses estimated the speed of the bus at between forty-five to fifty miles per hour. (*See* Bell Deposition at 31, Gross Deposition at 38, Wilson Deposition at 29). It appeared to some that Wilson wanted to pass the bus. The witnesses watched his car overtake the bus at a velocity estimated by some to be between fifty and fifty-five miles per hour (*see* Wilson Deposition at 22, Schneider Deposition at 23, Gross Deposition at 40), and by others, as "a high rate" (*see* Bell Deposition at 32, McQuire Deposition at 32) or sixty-five miles per hour or more. (*See* Newcomb Deposition at 20). Wilson's car may have been "throwing snow" in the left lane. (*See* Bell Deposition at 50 and 84).

Suddenly, Wilson's car spun out of control and slid sideways into the right lane. The slide was said to be to the west, possibly with a northern component, with the front of the car angled somewhat east of north. (*See* Newcomb Deposition at 38, McQuire Deposition at 18). Bell estimated that the car slid into his lane five feet in front of him. (*See* Bell Deposition at 33 and 38). McQuire estimated that the car began spinning about ten feet away from the bus and slid into the right lane about four to six feet away from the bus. (*See* McQuire Deposition at 15 and 20). Newcomb put the distance between the bus and car, after it entered the right lane, at about ten to fifteen feet. (*See* Newcomb Deposition at 11). Most of the witnesses say the Wilson vehicle was still moving at the time of impact. (*See* Bell Deposition at 81, Newcomb Deposition at 32, McQuire Deposition at 17 and 18, Gross Deposition at 15 and 46).

Wilson alone has testified that his car stopped about seventy-five to a hundred yards in front of the bus in the right lane (*see* Wilson Deposition at 24) after he slid for "a couple hundred yards" (*see* Wilson Deposition at 27), and that the bus hit the car only after it came to rest with its front wheels on the shoulder and the rear of the car jutting out into the right lane. (*See* Wilson Deposition at 28) Wilson testified that half of his car was extended out past the right-hand tire track right before the crash. (*See* Wilson Deposition at 52).

There is some testimony as to what action was or was not taken by Bell in reaction to the loss of control by the Wilson vehicle. Bell testified that he locked up all his brakes by "popping" the emergency brake (*see* Bell Deposition at 38 and 43) and tried to turn slightly to the left to miss Wilson but did not have enough time. (*See* Bell Deposition at

44). Schneider corroborated this testimony. (*See* Schneider Deposition at 12). Others did not recall seeing the bus attempt to move into the left lane. (*See* McQuire Deposition at 34 and Gross Deposition at 25).

Testimony as to the time interval between the events preceding the collision and the collision are as follows: Bell estimated that the time between his locking up of the bus brakes and the crash was two to four seconds. (*See* Bell Deposition at 45). Newcomb reported that the crash occurred "within seconds" of the entrance of Wilson's car into the right lane. (*See* Newcomb Deposition at 11). McQuire testified that the time between the beginning of Wilson's slide and the collision was one to two seconds. (*See* McQuire Deposition at 18). Gross estimated that the time between the beginning of the spinout and the crash was a split second. (*See* Gross Deposition at 15). Schneider's testimony also indicates that Bell had very little time to react: he testified that the time that passed between his seeing the brake lights of the bus go on and impact was less than five seconds (*see* Schneider Deposition at 13), and the time that passed between the car's finishing its spin to impact was one to two seconds. (*See* Schneider Deposition at 33).

Only Wilson testified that the bus had more than a few seconds to stop. He testified that the car was at rest in the bus's path for some fifteen to twenty seconds before being struck. (*See* Wilson Deposition at 28).

The right corner of the bus hit the passenger side of the car between the front fender and the door. From an examination of the damage to the car, the experts have estimated that the differential in velocity between the two vehicles was about twenty to twenty-five miles per hour. The impact threw plaintiff's seat backward, and she allegedly sustained severe head injuries, including a bifrontal skull fracture, a left frontal epidural hematoma, and a right lateral orbital fracture, and multiple contusions and abrasions. She seeks recovery of the costs of treatment and compensation for the physical and emotional harms which she has suffered.

## III. *EVIDENCE OF CAUSATION*

Most of the variations in the stories of the eyewitnesses are minor, with the exception of the account rendered by Jeffrey Wilson [3]. Because I consider this motion in the light most favorable to the non-movant, I accepted Wilson's version of the facts as true, and I asked the parties to address the question of causation. The purpose of an evidentiary hearing, held on July 6, 1995, was to determine what evidence, if any, supported plaintiff's theory that the bus driver's negligence caused the collision. Simply put, I sought to determine whether there is evidence that a non-negligent bus driver could have stopped. If so, then a triable issue of fact potentially exists; if not, then, clearly, plaintiff will be unable to meet her burden of showing that it is more likely than not that, but for Bell's negligence, the bus could have stopped, and summary judgment should be granted for defendants.

Because the causation inquiry depends upon the application of principles of physics and mathematics for its resolution, the parties properly relied on expert testimony in addressing my concerns at the evidentiary hearing. Plaintiff submitted testimony from three allegedly qualified expert witnesses: Professor James Bernard, a mathematician (by deposition and affidavit); Weldon Greiger, an accident reconstruction expert retired from the Michigan State Police (by deposition and live testimony); and Harold Stuckey [4], a bus driver. At the evidentiary hearing, the defendants also presented an expert, Luther Cox, a consulting engineer with a Bachelor of Science degree in mechanical engineering among his credentials.

---

**3.** Indeed, Wilson's testimony as to the stopping distance and stopping time of the bus and the velocities of the vehicles is not only inconsistent with that proffered by the other eyewitnesses; as plaintiff's own expert, James Bernard, has admitted in an affidavit, it is internally inconsistent as well.

**4.** Because Stuckey's deposition testimony goes to issues that the court need not reach, it will not be discussed here. For the same reason, the testimony of defendants' expert, David Hott, will not be discussed here.

Greiger's familiarity with the facts of this case came mainly from reading the depositions and statements of the parties and eyewitnesses. He also had access to photographs and some vehicular data, such as a "crush profile" created by the police. Neither he, nor anyone else, ever tested or knew the coefficient of friction between the bus's or the car's tires and I–94, as it existed on the day of the accident. Because a reconstruction of the accident requires a value for the coefficient of friction in order to compute the time it would take for the bus to come to a stop, the time it would take Wilson's car to travel from one point to another, and the ability of the bus to move to the left without losing control, Greiger found it necessary to assume a number to be the true value of the coefficient of friction. He testified at the evidentiary hearing that he selected .25, the low-end value for snow, from a textbook. He further testified that he believes that this is the lowest value within the plausible range of values. Based on his assumed value of the coefficient of friction and Wilson's testimony, Greiger testified that the bus could have avoided the collision if Bell had promptly applied his brakes or moved to the left.

Bernard's testimony is also based on an assumed value for the coefficient of friction, and in any event, is not very helpful to plaintiff. In his deposition, he testified that he could not determine whether the bus could move left to safely avoid the car because there are too many unknowns. In his affidavit, his opinion that the bus could have moved left in time is premised on an unsupported assumption as to how much of the Wilson vehicle was in the right lane, and so will not be considered. His opinion as to whether the bus could have braked within fifteen seconds is not consistent with all of the evidence of record.

Defendants' expert, Luther Cox, testified at the evidentiary hearing that it can not be known whether the bus could have safely avoided the car, given the conditions that existed at the time and place of the collision. Cox explained that this is because of uncertainty as to the coefficient of friction on the highway in question. Portions of his testimony, reproduced below, are educational.

Upon direct examination by defendants' representative, Cox explained that there is insufficient physical evidence to reconstruct this accident. He stated:

> Let's start with the pavement surface ... [which] has ruts in the right lane but some snow in the left lane. There's testimony of snow having been accumulated in higher depth on the shoulder. There is in this type of situation an unevenness of the coefficient of friction within the left lane, because if you have rutting it can cause disturbances or loss of control in any of these areas of snow and ice. You have patches of ice, you have areas where you may have absolutely good direct contact with the pavement, which might give you very high levels of coefficient of friction for a few feet, which can cause disturbances. That all has to do with the pavement surface and how fast you can slow down, speed up or change lanes.... You can't state an opinion as to the specific coefficient of friction on the pavement surface under these unusual conditions.

Evidentiary Hearing Transcript at 84–85.

Cox recognized that there are general values in the literature that are used to gain some perspective, but that they are of limited usefulness in this case. He stated that

> although there are some values given in the literature ... they are not specific enough that you can tell on this highway, under the conditions that you've got ... [what the coefficient of friction would be].... [I]f I was there to test the conditions shortly afterwards, I might have been able to make a valid test to see whether or not there were any radical temperature changes or a calculation of traffic conditions changing it ... [S]o many things are changeable on that highway in a short period of time, that I couldn't give an opinion as to what the coefficient of frictions [sic] would be.

Evidentiary Hearing Transcript at 95.

When asked what value he used for the coefficient of friction in making his calculations, Cox testified that he used values ranging from .14 to .55. (Evidentiary Hearing Transcript at 109). He also indicated that

the applicable value could be as low as .1, the measure for slick ice. (Evidentiary Hearing Transcript at 112).

## IV. *ANALYSIS*

In considering this motion for summary judgment, I initially assume that the testimony of Wilson that his car was stopped in the path of the bus for fifteen to twenty seconds, with its front wheels on the right shoulder, is true. I also assume that his testimony that he was seventy-five to one hundred yards away from the bus when he stopped is true.

This does not mean that defendants' motion for summary judgment can not be granted. By themselves, the time and distance estimates do not suffice to meet plaintiff's burden[5].

### *ADMISSIBILITY OF EXPERT TESTIMONY*

 Plaintiff will be unable to prove by a preponderance of the evidence that Bell's negligence resulted in her injuries because the opinion testimony of her experts relating to this issue must be excluded. The probative force of these opinions, particularly Greiger's, relying as they do on an assumed value for the coefficient of friction, goes no further than establishing that a possibility exists that the bus could have avoided the car in which plaintiff was traveling if Bell had acted prudently. This falls short of what is required to justify the admission of this testimony into evidence; so-called "proof" that establishes a possible causal link does not satisfy the plaintiff's burden. *See Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349, 1359–1360 (1992). To allow such "proof" to come before a jury would disserve the principles expounded by the United States Su-

preme Court in the *Celotex* trilogy. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (after sufficient time for discovery, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); and *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.')

 Since *Celotex, Anderson,* and *Matsushita,* the Supreme Court has extended the trial judge's role as the gatekeeper who guards against frivolous cases through summary judgment to encompass a judge's decision whether to admit offered scientific proof into evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), addressed the proper standard for admitting expert scientific testimony. In that case, the Court rejected the test for admissibility under *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (D.C.Cir.1923), which forbade the admission of expert opinion based on a scientific technique unless the technique was "generally accepted" as reliable in the relevant scientific community. The Court held that the Federal Rules of Evidence had supersed-

---

5. The methodology used by the plaintiff's expert, Greiger, was attacked at the evidentiary hearing. Apparently sensing the possibility that Greiger's testimony might not be admitted, the plaintiff, in her second supplemental brief, has argued that Wilson's statement in his affidavit that "the bus should have been able to stop or take evasive action to avoid striking my car", together with his testimony as to stopping time and distance, constitute sufficient evidence of causation to warrant survival of a motion for summary judgment. I find this argument spurious. Wilson is competent to testify to the facts (ie, perceived time and

distance), but any conclusions as to whether, given these facts, the bus could have stopped, must be established by expert testimony. Opinion testimony on the ultimate issue to be decided, causation, in not within the province of the lay witness in this case, for it is neither "rationally based on the perception" of Wilson or "helpful to a clear understanding" of his testimony or a fact in issue, as required by FED.R.EVID. 701. Thus, the resolution of the motion for summary judgment directly depends on the admissibility, or non-admissibility, of the opinions proffered by plaintiff's experts.

ed the *Frye* test. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2793.

Turning to the limits of admissibility of purportedly scientific evidence, the Court began with FED.R.EVID. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Daubert,* at ——, 113 S.Ct. at 2795.

Read in conjunction with Rule 402's mandate that only relevant evidence [6] may be considered, the Supreme Court ruled that a district court judge must determine at the outset whether the reasoning or methodology underlying an expert's opinion is "scientifically valid" and whether it is capable of being properly applied to the facts in issue.

 The logic of *Daubert* is fairly straightforward. Rule 702 requires that expert opinion relate to "scientific knowledge." This means that, to be admissible, an expert's opinion must be supported by "more than subjective belief and unsupported speculation" and should be supported by " 'good grounds,' based on what is known." [7] *Daubert,* at ——, 113 S.Ct. at 2795. Furthermore, to be admissible, there must be sufficient "fit" between the facts of the case and the proffered testimony, *see Daubert,* at ——, 113 S.Ct. at 2796, in keeping with Rule 702's requirement that the testimony assist the trier of fact to understand the evidence or to determine a fact in issue. The trial

judge must decide, as a preliminary matter, "whether expert testimony ... is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert,* at ——, 113 S.Ct. at 2796, quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3rd Cir.1985).

The expert testimony offered by plaintiff, grounded as it is in an assumption that the coefficient of friction on westbound I-94 on January 10, 1993, was greater than or equal to a value taken from a textbook's table for the coefficient of friction for wet pavement, clearly fails to pass the *Daubert* test [8]. Plaintiff's evidence might be acceptable if the conditions on I-94 were established and uniform, but the facts of this case are otherwise. The testimony of the eyewitnesses establishes that the condition of I-94 on the date of this accident was anything but uniform. It is undisputed that it had snowed and that there was snow on the ground, although it is not clear whether the tire tracks in the right lane were merely wet or snowy or icy. The testimony indicates that there were "tracks" in the right lane, but it does not indicate whether the tracks consisted of packed snow, ice, or slush. Wilson did say that he did not recall seeing any ice, but that statement, by itself, does not rule out the possibility that ice was present, perhaps covered by a light film of snow, perhaps appearing in random patches here and there. In contrast, McQuire and Newcomb testified that they encountered ice, and Bell stated that he saw ice in the right lane. This testimony has not been refuted. Since ice was described as being in the right lane, the possibility that it

---

**6.** Relevant evidence is evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401.

**7.** Rule 702 likewise speaks to "technical and other specialized knowledge", but the Supreme Court in *Daubert* focused on "scientific knowledge." *See Daubert,* at ——, 113 S.Ct. at 2795, n. 8. Whether the coefficient of friction data falls under the former or the latter category, presumably the requirement of evidentiary reliability announced in *Daubert* applies. As the word "knowledge" appears in both of the terms ("scientific knowledge", "technical or specialized knowledge"), it remains true that the expert's

opinion must be based on "more than subjective belief or unsupported speculation", because this is the connotation of the word "knowledge." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795.

**8.** Plaintiff, in her supplemental brief, has provided a sample table for the coefficient of friction, found at page 109 of *Am.Jur., Proof of Facts, Fact Book* (1983). The table shows that the coefficient of friction for "wet" pavement can range from .25 to .80, depending on the material used in the road and the velocity of the vehicle. The values shown for smooth ice range from .05 to .1. The values shown for both packed and loose snow range .30 to .60. Plaintiff's choice of .25 approximately equals the lowest value for snow, .30.

existed to some degree within the ruts of the road has certainly not been ruled out. Plaintiff can not put forth evidence that the highway was uniformly wet or snowy on the day of the accident, and the expert testimony proffered is therefore inadmissible for a "lack of fit."

Plaintiff argues that it is unimportant that the precise value of the coefficient of friction for the roadway in question is unknown, because plaintiff's experts are picking the scenario most favorable to the defendants by choosing the lowest coefficient of friction from the range for snow-covered pavement. While plaintiff is correct that *"Daubert* requires only scientific validity for admissibility, not scientific precision," *U.S. v. Bonds,* 12 F.3d 540, 558 (6th Cir.1993) [9], her assertion that she has selected the lowest value of the coefficient of friction that was possible for the road conditions in question can not withstand scrutiny. This is critical because plaintiff bears the burden of proof on causation. Thus, plaintiff's experts would have to choose the low endpoint of the true possible range of values for the coefficient of friction (that most favorable to defendants) for the purpose of making their calculations. It would not do for the experts to base their opinions on, for example, the midpoint value of the possible range. Yet, if I were to accept that the coefficient of friction was .25 or more, I would, in effect, be allowing the arbitrary choice of a midpoint value because the true possible range is in fact broader than that for snowy or wet conditions. The true range would encompass values ranging from glare ice to dry pavement, a range spanning from about .1 to about .75. By choosing .25 for the coefficient of friction, plaintiff's expert essentially is "eyeballing" the true possible range for a value that is favorable to plaintiff's case, in the guise of choosing a value that is most favorable to defendants.

Such an "eyeballing" approach as is described above was properly rejected by the district court judge in *Ayers v. Robinson* as "unscientific." *Ayers v. Robinson,* 887 F.Supp. 1049, 1060–1061 (N.D.Ill.1995) (Court would not accept choosing midpoint value of 3.5 million dollars as "benchmark" measure of loss of hedonic, or pleasure, value of life for the statistically average life, the true value of which was estimated to lie somewhere between $500,000 and $9,000,000). As in that case, the data on which plaintiff relies "goes to one thing" (friction on snow-covered pavement) while a jury would need information of a very different sort (the ability to stop on I–94's uneven and potentially icy pavement). *See Ayers,* 887 F.Supp. at 1062.

I conclude that Greiger's and Bernard's testimony as to whether Bell's negligence caused this accident is inadmissible because the coefficient of friction value which was used is too speculative to assist a jury in deciding whether Bell's allegedly careless conduct caused this accident. Without the admission of the expert testimony in this case, plaintiff can not meet her burden of proof. Defendants' initial burden, the pointing out of an absence of a genuine issue of material fact under *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553, has been satisfied. Absent the expert testimony which has been excluded, plaintiff does not have a scintilla of evidence supporting her theory of the case. Therefore, summary judgment in favor of defendants is hereby GRANTED.

IT IS SO ORDERED.

---

**9.** This statement in *Bonds,* a case involving DNA testing, was preceded by the following language:
> Defendants do not challenge the fact that the specific application of the methodology used by the FBI generated *some probability* that the DNA sample that 'matched' Bonds's sample in fact came from Bonds; they only challenge the precision of that probability estimate. 12 F.3d at 558. (emphasis added)

In contrast, defendants in this case do challenge the fact that the application of the "text-book" methodology used by plaintiff's experts generate any probability that the bus could have stopped in the required time and distance. In *Bonds,* there was more anchoring the expert testimony to the facts of the case than there is here, for it was known that the control sample actually came from Bonds. In contrast, in this case, the choice of the value of the coefficient of friction is based largely on speculation.