998 F.2d 358
 Prod.Liab.Rep. (CCH) P 13,534
Margaret ZETTLE, Personal Representative of the Estate of
David R. Zettle, Deceased, Plaintiff-Appellant,
v.
HANDY MANUFACTURING COMPANY, a foreign corporation, d/b/a
Western Manufacturing Corporation, Defendant-Appellee.
 No. 92-1346.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 11, 1993.
Decided July 7, 1993.
 
 Kevin J. Rieman (argued and briefed), Patterson, Gruber, Kennedy, Gill & Milster, Bay City, MI, for plaintiff-appellant.
 Stephanie A. Neal (briefed), Warren A. Hampton (argued), Neal, Neal & Stewart, Flint, MI, for defendant-appellee.
 Before: MERRITT, Chief Judge, and BOGGS and BATCHELDER, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 Plaintiff's decedent was electrocuted September 20, 1988, apparently while using a washer manufactured by defendant. Plaintiff brought suit in state court against decedent's employer and against defendant manufacturer, raising claims of negligent design and inadequate warning under Michigan law. After plaintiff's action against the employer was resolved, defendant removed the case to federal district court pursuant to its diversity jurisdiction. The district court granted summary judgment to defendant on all claims, and plaintiff appeals. For the following reasons, we affirm the judgment of the district court.
 
 I.
 
 2
 Plaintiff's deceased son, 18-year-old David Zettle, worked as a farm hand for the Schmidts, neighbors of the Zettles. On the morning of September 20, 1988, Zettle was given the hand-held sprayer component, or "wand," of a Handy Industrial Model 1000 Power Washer by Mike Schmidt, his employer's son, to clean a semi truck. He was found dead moments later on his back about 15 feet from the washer cabinet, with the wand of the washer lying across his chest.
 
 
 3
 The Handy 1000 model in question was built in 1980. It is composed of a cabinet about four feet tall that takes water from a local source and pumps it at high pressure through a rubber hose to a spraying wand. The wand is all metal, although all other power washer models manufactured by Handy in 1980 and subsequent versions of the Model 1000 (1981 onward) were built with cheaper, non-conductive plastic molded grip handles. The unit receives electricity to run its pump through a heavy, insulated power cord with a three-prong plug. Handy relies on the user of the portable machine to connect it to ground by placing the three-prong plug into a properly grounded receptacle or power supply cord.
 
 
 4
 On the day of Zettle's death, a homemade cord was used to carry electricity from the tool shed near the scene of the accident to the washer itself. The extension cord was made of lightweight electrical cord, with several slashes along its length exposing bare metal wire, and a section in the middle was completely bound with electrical tape, suggesting a splice. The ground wire in the cord was not connected to the ground prong at the male end of the cord. The metal junction box at the other end, into which the plug from the washer was inserted, was not suitable for outdoor use. The parties agree that the washer cabinet must have become "energized" because of stray current "backing up" through the ground wire of the extension cord.
 
 
 5
 A red label on the top of the cabinet reads:
 
 STOP
 
 6
 Read instructions on inside of lid before operating.
 
 
 7
 Connect only to grounded 115 volt supply of ample capacity.
 
 
 8
 Extension cords should be no. 12 grounded wire.
 
 
 9
 Removal of ground (3rd) prong on plug could cause death.
 
 
 10
 (Capitalization and underlining in original.) It is not disputed that the label was visible and legible at the time of the accident.
 
 
 11
 Plaintiff contends that current flowed through the water in the hose, since water may conduct electricity if impurities are present, and through the metal handle of the wand to kill the decedent. Since the wand handle could have been made of non-conducting plastic, plaintiff argues Handy should be held liable for negligence in designing it of metal. The district court found that plaintiff failed to set out a prima facie case because there was no direct evidence that the wand itself was electrified, or that lethal current flowed through the handle as opposed to any other part of the wand. Reasoning that a jury therefore could not possibly conclude that use of a plastic handle would effectively have minimized the risk of harm, the district court granted summary judgment to defendant on plaintiff's negligent design claim.
 
 
 12
 Plaintiff also contends that the warning placed on the cabinet by defendant was inadequate to alert users to the danger of electrocution, because it did not warn that death might ensue even if the ground plug were not removed, or if a damaged extension cord were used. She also offered the testimony of William Heilman, a purported safety expert, that the warning words used were insufficient to convey a serious threat of danger. The district court held that this evidence did not constitute the "affirmative evidence" required to send the issue to the jury, and granted summary judgment to defendant on this issue as well. The district court also granted summary judgment on a third claim, negligent failure to notify purchasers of post-manufacture safety advances, from which plaintiff does not appeal.
 
 
 13
 We review a district court's grant of summary judgment de novo. Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). We must view the facts in a light most favorable to the non-moving party, here, the plaintiff. Boyd v. Ford Motor Co., 948 F.2d 283, 285 (6th Cir.1991). Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions and trial courts should, therefore, act with caution in granting summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Since the district court granted summary judgment to defendant on both the defective design and inadequate warning claims, we examine each in turn.
 
 II.
 
 14
 We do not write on a clean slate. The Michigan Supreme Court has spoken unequivocally on the test to be applied in this and similar cases. In Prentis v. Yale Mfg. Co., 421 Mich. 670, 365 N.W.2d 176, 186 (1984), the court adopted, "forthrightly, a pure negligence, risk-utility test in products liability actions against manufacturers of products, where liability is predicated upon defective design." Prentis was injured in an accident involving the operation of a hand-operated forklift. The Prentis court considered four different possible standards to apply in determining the scope of a manufacturer's liability for a design defect before choosing the pure risk-utility test articulated by Prof. John Wade of Vanderbilt Law School over two decades before. Id. 365 N.W.2d at 182-84; see John W. Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 834-35 (1973). The Michigan Court of Appeals recently clarified this standard in Reeves v. Cincinnati, Inc., 176 Mich.App. 181, 439 N.W.2d 326 (1989):
 
 
 15
 [A] prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of the foreseeable risks, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident. It secondly requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger.
 
 
 16
 Id. 439 N.W.2d at 329. The district court found that plaintiff failed on both prongs of the Reeves test.
 
 
 17
 Underlying our de novo review of the adequacy of plaintiff's evidence to withstand summary judgment on either of these two prongs is the issue of the proper limits to be placed on a product liability plaintiff's ability to take her case to an often sympathetic jury. If a plaintiff may proceed with merely the opinion of an "expert witness" retained specifically for that purpose, whose unsupported testimony is construed to create an "issue of material fact" to avoid summary judgment under Fed.R.Civ.Proc. 56(c), it is difficult to conceive of any product liability case that could not proceed to trial.[1]
 
 
 18
 Again, we do not write on a clean slate; the Michigan Supreme Court has addressed the issue. In Moning v. Alfono, 400 Mich. 425, 254 N.W.2d 759 (1977), the court stated the following concerning the jury's role in determining defendant manufacturer's liability:
 
 
 19
 If the issue is left to juries to decide, different juries will, indeed, reach different results, sometimes in cases appearing to be factually indistinguishable.... The preference for jury resolution of the issue of negligence is not, however, simply an expedient reflecting the difficulty of stating a rule that will readily resolve all cases; rather, it is rooted in the belief that the jury's judgment of what is reasonable under the circumstances of a particular case is more likely than the judicial judgment to represent the community's judgment of how reasonable persons would conduct themselves.
 
 
 20
 Id. 254 N.W.2d at 763. However, even in Moning, the court recognized that the "issue of negligence may be removed from jury consideration if the court concludes that overriding considerations of public policy require that a particular view be adopted and applied in all cases." Id. 254 N.W.2d at 770.
 
 
 21
 In Owens v. Allis-Chalmers Corp., 414 Mich. 413, 326 N.W.2d 372 (1982), the Michigan Supreme Court considered and rejected the conclusion of the Michigan Court of Appeals that "the nature of adjudication is not such as to be amenable to competent evaluation of the reasonableness of ... design decisions." Id. 326 N.W.2d at 377.[2] The Court of Appeals would have adopted a bright-line rule permitting a finding of manufacturer liability only where the plaintiff made a showing that "the particular design was not in conformity with industry design standards, design guidelines established by an authoritative voluntary association, or design criteria set by legislative or other governmental regulation," or in cases of latent risk of injury without proper warning. Id. at 375. In rejecting this test and using the negligence test that would later be explicitly articulated in Prentis, supra, the Owens court nevertheless indicated an unwillingness to send every case to the jury, reaffirming that manufacturers "are not insurers that in every instance and under all circumstances no injury will result from the use of their products." 326 N.W.2d at 379. The court indicated the stringency of the test to be applied: "an examination of the effects of any proposed alternative design must bear a heavy burden in determining whether the chosen design was unreasonably dangerous." Id.
 
 
 22
 In Owens, the plaintiff alleged that his injury from being pinned under an overturned forklift would have been prevented had the manufacturer installed some sort of driver restraint as standard equipment, and the failure to do so was a design defect. The court found that plaintiff had not established a prima facie case, demonstrating neither sufficient magnitude of foreseeable risk nor sufficient reasonableness of proposed alternatives:
 
 
 23
 Although from the testimony of plaintiff's expert one might infer that a forklift rollover and the injuries resulting from being pinned under the overhead protective guard were foreseeable, neither his testimony nor any other evidence on the record gave any indication how likely such an event might be.
 
 
 24
 ....
 
 
 25
 In the entirety of plaintiff's proofs, there is no data or other factual evidence concerning the magnitude of the risks involved, the utility or relative safety of the proposed alternatives, or evidence otherwise concerning the 'unreasonableness' of risks arising from [the alleged defect].
 
 
 26
 Id. at 379.
 
 
 27
 The Michigan Supreme Court has spoken with sufficient clarity in Owens and Prentis to permit a forthright application of its risk-utility test to the facts before us. First, plaintiff was required to show the magnitude of risks foreseeable by defendant manufacturer from using a metal handle on the power washer instead of a plastic one, including the likelihood of electrocution and the severity of such injuries. The severity test is obviously the easier one; a likely result of electrocution is death. However, plaintiff has failed to show that the likelihood of electrocution resulting from its design choice was foreseeable by the manufacturer. Plaintiff points out several admissions made by Wayne Sieverding, a mechanical engineer with an ownership interest in 25% of defendant's stock, in his deposition, including the following facts of which defendant was aware: (1) that farmers commonly had ancient wiring systems; (2) that they frequently disconnected their grounding systems to adapt the washer to their out of date wiring; and (3) that as a group, they were very careless. Sieverding also admitted knowledge of safety alerts from the U.S. Consumer Products Safety Commission, prior to Zettle's death, reporting at least 13 fatalities caused by electrical shock from pressure washers. These facts do not constitute a sufficient showing of foreseeability. That farmers are, as a general rule, careless with their often-substandard electrical wiring supports with equal force the proposition that a plastic handle would have had a negligible impact on the occurrence of electrocutions. Faulty wiring could result in electrocution at the moment the cord is connected to the power supply or while the washer cabinet is being moved, neither of which would require contact with the metal handle at all. As to the safety alerts from the U.S. Consumer Products Safety Commission, the parties stated at oral argument that they occurred after the product was manufactured, so the alerts are irrelevant to the question of foreseeability at the time of product design. See Prentis, 365 N.W.2d at 183 n. 19.
 
 
 28
 Plaintiff also failed to demonstrate that her proposed alternate design, i.e. a plastic handle instead of a metal one, "would have been effective as a reasonable means of minimizing the foreseeable risk of danger. This ... showing may entail an evaluation of the alternative design in terms of its additional utility as a safety measure ..." Reeves, 439 N.W.2d at 329 (emphasis supplied). There were no witnesses to Zettle's electrocution. Defendant's experts have advanced possible alternatives (with varying degrees of likelihood) to plaintiff's theory that Zettle was electrocuted through the metal handle: He may have been holding the wand with both hands, allowing the electricity to enter through the long rigid metal tube component of the wand rather than through the handle. He may have touched the cabinet itself. It simply cannot be established that the current flowed through the metal handle of the wand to Zettle's body. Plaintiff therefore has failed to show by direct evidence that a plastic molded grip handle, such as the one used on subsequent models of the washer in question and on all other models sold by defendant, would have provided Zettle with "additional utility as a safety measure" as required by Reeves. The Owens court's requirement of "data or other factual evidence" concerning the "relative safety of the proposed alternative," 326 N.W.2d at 379, might have been satisfied with indirect evidence concerning the safety benefits of plastic handles. While it is undisputed that plastic will not conduct electricity and metal will, plaintiff has presented no evidence, statistical or otherwise, that defendant in particular or the industry in general has experienced fewer accidents from the use of plastic as opposed to metal handles. See Petto v. Raymond, 171 Mich.App. 688, 431 N.W.2d 44, 47 (1988) (plaintiff failed to state prima facie case partly due to lack of evidence concerning frequency of accidents such as his). We conclude for these reasons that summary judgment was properly granted to defendant on plaintiff's claim of negligent design.III.
 
 
 29
 Plaintiff's other argument on appeal is that the warning on the power washer was inadequate to protect users. The parties agree that by placing a warning label on the top of the washer cabinet, defendant undertook a duty to warn. Once that duty is established, the manufacturer's warning must be "adequate, accurate and effective." Antcliff v. State Emp. Credit Union, 414 Mich. 624, 327 N.W.2d 814, 820 (1982). The district court recognized that "beyond the court's initial determination of the legal question of the existence of a duty to warn, a particular warning's accuracy, adequacy and effectiveness are questions which, if supported by competent evidence, are reserved for the jury. Hill v. Husky Birquetting, [Briquetting] Inc., [54 Mich.App. 17] 220 N.W.2d 137, 141 (1974)." App. at 33. However, the district court found that "the evidence of record would not allow a reasonable juror to find the warning inadequate, inaccurate or ineffective. As a matter of law, then, this question as well is resolved in favor of the defendant." Id. at 36. The district court found that a warning with the different language proposed by plaintiff's expert ("Danger" rather than "Caution" or "STOP") would not have deterred Zettle from using the homemade cord since he, an "average user," had "blithely ignored ... the clear, indeed dazzling, danger presented by using a chopped-up, cobbled-together and obviously damaged electric cord stretching through the water and mud of the farmyard that day." Id.
 
 
 30
 The district court's observations concerning the obvious nature of decedent's peril are irrelevant to the question of adequacy of a required warning. The Michigan Supreme Court held recently in Glittenberg v. Doughboy Recreational Ind., 441 Mich. 379, 491 N.W.2d 208, 215 (1992) that "if the risk is obvious from the characteristics of the product, the product itself telegraphs the precise warning that plaintiffs complain is lacking," and no warning is required. Here, however, defendant concedes a duty to warn.
 
 
 31
 Plaintiff argues that this duty was not satisfied since the warning did not notify users of the precise danger of using an ungrounded cord; death is mentioned only as a possible consequence of removing the ground plug from the washer's power cord. We disagree. The warning instructs users to connect "only to grounded" power supplies. The next line again mandates that "[e]xtension cords should be no. 12 grounded wire." (Underscoring in original.) The warning begins with "STOP" and ends with "could cause death." We agree with the district court that no reasonable trier of fact could find this warning inadequate to convey both the nature and the scope of the peril of using an extension cord that is rendered ungrounded for any reason.
 
 IV.
 
 32
 The facts of this case are undeniably tragic. Where manufacturers cause such heart-rending accidents through negligent design of their products, they may properly be held accountable. Michigan products liability law does not protect the consumer from every possible misfortune that may occur when using a manufacturer's product, however, and plaintiff has failed to demonstrate that she meets the prerequisites for recovery. For the foregoing reasons, we AFFIRM the summary judgment granted by the district court.
 
 
 
 [1]
 Justice Frankfurter commented on the problem presented by judges unwilling to take responsibility in limiting access to juries: "The easy but timid way out for a trial judge is to leave all cases tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge." Wilkerson v. McCarthy, 336 U.S. 53, 65, 69 S.Ct. 413, 419, 93 L.Ed. 497 (1948) (Frankfurter, J., concurring)
 
 
 [2]
 As the Owens court recognized, the Court of Appeals was heavily influenced by the work of James Henderson, who described manufacturers' design choices as "polycentric," the result of many interrelated considerations, of which safety is but one. See James A. Henderson, Jr., Judicial Review of Manufacturers' Design Choices: The Limits of Adjudication, 73 Colum.L.Rev. 1531 (1973)