**Richad ASAD, et al. Plaintiffs**

v.

**CONTINENTAL AIRLINES, INC. Defendant**

**No. 1:99 CV 2194.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 31, 2004.

Richard C. Haber, Roy A. Hume, Reminger & Reminger, Cleveland, OH, for Plaintiffs.

Heather C. Logan, Matthew P. Moriarty, Tucker Ellis & West, Daniel F Petticord, Kevin M. Young, Brzytwa, Quick & McCrystal, Cleveland, OH, for Defendant.

## MEMORANDUM OF OPINION AND ORDER REGARDING THE DAUBERT HEARING AND THE ADMISSIBILITY OF EXPERT WITNESSES' TESTIMONY

WELLS, District Judge.

The issue currently before the Court is the admissibility of expert testimony offered on behalf of plaintiffs Richard, Darlene, and William Asad and on behalf of defendant Continental Airlines, Inc. ("Continental"). The scope and admissibility of expert witness testimony has been litigated throughout this case. On 6 July 2001, defendant filed a motion to exclude the expert testimony of plaintiffs' experts, Dr. Brautbar and Dr. Wiznitzer, or, in the alternative to compel Dr. Wiznitzer's compliance with Fed. R. Civ. Pro. 26(a)(2) and extend the deadline for the production of defendant's expert reports. (Docket # 47). An opposition and reply were subsequently filed as well. (Docket # 49 and # 50). On 7 August 2001, this Court issued an order granting in part and denying in part defendant's motion to exclude or compel. (Docket # 51). Expert discovery took an extended period of time, especially as the parties debated and finally agreed to environmental testing protocols.

Ultimately, the parties were ordered to file *Daubert* briefs in support of the admissibility of their expert opinions and a *Daubert* hearing was scheduled. (Docket # 61, # 83, # 99, # 101, and # 114). On 3 November 2003, both parties filed briefs in support of their expert witnesses. (Docket # 87 and # 88). Plaintiffs' expert witnesses are Dr. Henry Nowicki, Dr. Max Wiznitzer, and Dr. Nachman Brautbar. Defendant's expert witnesses consist of Dr. Thomas Enlow, Dr. Lawrence Fechter, Dr. Charles Lanzieri, and Dr. Richard O'Shaughnessy. On 26 November 2003, both parties filed briefs in opposition to the other parties' expert witnesses. (Docket # 102 and # 103). Plaintiffs' seek only the partial exclusion of Dr. O'Shaughnessy, Dr. Enlow, and Dr. Fechter's testimony. Defendants seek the total exclusion of all of plaintiffs' experts' testimony. To accommodate witnesses, the *Daubert* hearing was held in two stages. On 29 January 2004, Dr. Nowicki, Dr. Wiznitzer, Dr. Enlow, and Dr. O'Shaughnessy testified and were subject to questioning by counsel for both parties and by the Court. On 20 February 2004, the remaining expert witnesses, Dr. Brautbar, Dr. Fechter, and Dr. Lanzieri appeared, testified, and answered questions posed by counsel and the Court.

For the reasons that follow, the Court will allow Dr. Wiznitzer, Dr. Brautbar, Dr. Enlow, and Dr. Lanzieri to testify as expert witnesses on all of the opinions expressed in their expert reports. Further, the Court will allow Dr. Nowicki and Dr. O'Shaughnessy to testify as expert witnesses with certain limitations.

## I. FACTUAL BACKGROUND

Plaintiff Darlene Asad started working for Continental Airlines at the Cleveland Hopkins International Airport ("Cleveland Hopkins") in Cleveland, Ohio, on or about 15 June 1996. In early 1997, Ms. Asad became pregnant. Throughout the course

of her pregnancy, until the week before plaintiff Richard Asad was born, Ms. Asad worked part-time as a Customer Service Agent ("CSA") on Continental's Express Ramp, working four five-hour days and one eight-hour day per week. As a Ramp CSA, Ms. Asad de-iced airplanes, directed inbound and outbound airline traffic, chocked the airplanes' tires, set up cones to delineate safety zones, plugged the airplanes into a power source, and loaded and unloaded baggage. On 5 August 1997, Ms. Asad prematurely gave birth to Richard Asad. Richard Asad weighed three pounds, nine ounces at birth and was subsequently diagnosed with cerebral palsy and developmental delay.

Plaintiffs filed this personal injury action against Continental alleging that Richard Asad's cerebral palsy was proximately caused by his mother's *in utero* exposure to carbon monoxide while working for Continental. The parties' rely primarily on expert testimony in their respective efforts to prove and disprove the plaintiffs' theory.

## II. STANDARD

 Under the Federal Rules of Evidence, a trial judge performs the "gatekeeping" function of ensuring both the relevance and reliability of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Specifically, Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion

or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[1]

The relevancy requirement stems from Rule 702's mandate that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591, 113 S.Ct. 2786; *U.S. v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993). Relevance means that "there must be a 'fit' between the inquiry in the case and the testimony." *Bonds*, 12 F.3d at 555 (citing *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.) The reliability requirement is drawn from Rule 702's requirement that the subject of an expert's testimony be "scientific ... knowledge." *Daubert*, 509 U.S. at 589–90, 113 S.Ct. 2786; *Bonds*, 12 F.3d at 555. In this context, reliability means "evidentiary reliability" or "trustworthiness" which in turn connotes "scientific validity." *Bonds*, 12 F.3d at 555. A party proffering expert testimony has the burden of demonstrating by a " 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corporation*, 218 F.3d 566, 578 (6th Cir.2000). The trial court's focus should be on principles and methodology, not on conclusions that they generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

 Thus, the trial court must engage in a two part analysis. First, in terms of reliability, it should consider "whether the reasoning or methodology underlying the expert's testimony is scientifically valid."

1. According to the Advisory Committee Notes, the 2000 amendment reflects the holdings in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (expanding the applicability of *Daubert* to non-scientific expert witnesses).

*Daubert,* 509 U.S. at 592–593, 113 S.Ct. 2786. The Court in *Daubert* suggested several factors to consider in assessing an expert's reliability, although these factors are neither exclusive nor dispositive:

 a. Whether the expert's hypothesis can be, and has been tested;

 b. Whether the methodology has been subjected to peer review and publication;

 c. The frequency by which the methodology leads to erroneous results;

 d. The existence and maintenance of standards controlling the technique's operation; and

 e. Whether the methodology has been generally accepted in the scientific community.

*Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. The Sixth Circuit has recognized an additional factor that may be relevant to the reliability inquiry:

whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying because the former provides important, objective proof that the research comports with the dictates of good science.

*Smelser v. Norfolk Southern Railway Company,* 105 F.3d 299, 303 (6th Cir.1997). The reliability test is a flexible one and does not necessarily nor exclusively apply to all experts or in every case. *Kumho Tire v. Carmichael,* 526 U.S. 137 at 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 141–42, 119 S.Ct. 1167. Indeed, the Supreme Court clarified in *Kumho* that in

other cases, particularly those dealing with non-scientific experts, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho,* 526 U.S. at 150, 119 S.Ct. 1167.

■ In terms of relevancy, the trial court should consider "whether that reasoning and methodology properly can be applied to the facts at issue." *Id.; see also United States v. Smithers,* 212 F.3d 306, 315 (6th Cir.2000). Here the trial court must ensure that the proposed expert testimony is relevant to the task at hand and that there is a proper fit between the inquiry in the case and the testimony. *Bonds,* 12 F.3d at 555; *In re Dow Corning Corporation,* 237 B.R. 364, (Bkrtcy. E.D.Mich.1999) (citing *Smelser v. Norfolk Southern Ry.,* 105 F.3d 299 (6th Cir.1997)).

■ Finally, even if an expert passes through the admissibility gate of Rule 702, the trial court may still find an expert's testimony inadmissible under Rule 403, that is, if its probative value is outweighed by prejudice to the opposing party. *United States v. Thomas,* 167 F.3d 299, 308 (6th Cir.1999).

## III. ANALYSIS

### A. Plaintiff's expert witnesses

1. *Dr. Henry Nowicki*

Dr. Nowicki is an environmental scientist with a Ph.D. in organic biochemistry, and he is the president of Professional Analytical and Consulting Services ("PACS"), a company providing a broad range of services including environmental site assessments, regulatory risk assessments, and toxicology and managing consulting services. (Hearing Tr. at 40–41; Docket # 91, Ex. F).[2]

Pursuant to the parties' agreed protocol, Dr. Nowicki conducted three days of air quality studies at Cleveland Hopkins, test-

**2.** Because the *Daubert* hearing was conducted

over the course of two days, "Hearing Tr."

ing for carbon monoxide ("CO") exposure levels, on 6, 10, and 12 June 2002. (Hearing Tr. at 42; Docket # 91, Ex. Q). These tests consisted of the following five sets:

1) On each testing day, Continental assigned two CSA employees to wear personal monitors for CO exposure while performing their normal duties.

2) Dr. Nowicki used a hand held CO monitor to continuously monitor CO throughout the work day in various locations at the airport.

3) Dr. Nowicki took spot measurements for CO using a portable hand held monitor in areas where Continental employees work while performing their duties in and around locations identified in Set 2.

4) CO measurements were taken at the midfield aircraft parking location where Darlene Asad worked in 1997.

5) CO measurements were taken in the break rooms near the locations identified in Set 2.

(Docket # 91, Exs. E and Q; Hearing Tr. at 62–63).[3] These tests revealed no CO

measurements that exceeded EPA's standard of 9 parts per million ("ppm"), let alone the American Conference of Governmental Industrial Hygenists ("ACGIH") threshold limit value of 25 ppm.[4] (Docket # 91, Ex. K and Ex. E, at 1; Hearing Tr. at 46).

In addition to the testing conducted by Mr. Nowicki, Continental conducted its own its own air quality studies, which measured CO exposure, at its Los Angeles, Houston, Newark, and Cleveland airports—all Continental Airline hubs.[5] (Fechter Aff. at ¶¶ 12 and 14). All CO measurements were made using CO datalogging instruments in the breathing zones of workers on the ramps and in the baggage handling areas to assess both the 8–hour TWA and ceiling (instantaneous peak) exposures. (Fechter Aff. at ¶ 13). In the tests conducted at Cleveland Hopkins, 8–hour TWA exposure ranged from a low of .037 ppm to a high of 8.99 ppm, and the two highest peak exposures were 126 ppm and 256 ppm.[6] (Fechter Aff. at ¶ 14). Results from testing at the other three airports indicated an 8–hour TWA of .01 to

refers to the hearing on 29 January 2004 and "Hearing Tr. II" refers to the hearing on 20 February 2004.

3. Both parties used the same devices or "badges" to measure CO exposure during their air quality studies, devices which are commonly used and relied on by experts in the field. (Hearing Tr. at 63).

4. CO dose and exposure limits are generally described in two ways: 1) time weighted averages ("TWA"), which evaluate CO dose over an 8 hour day; and 2) peak levels, which are the highest levels recorded. (Fechter Aff. at ¶ 12). Numerous governmental agencies have issued exposure limits based on both TWA and peak levels. With respect to threshold limits for an 8–hour TWA, in addition to the ACGIH and EPA standards, OSHA maintains a permissible exposure limit of 50 ppm and the National Institute for Occupational Safety and Health ("NIOSH") has established a recommended exposure limit of 35 ppm. (Fechter Aff. at ¶¶ 11 and 14; Hearing Tr. at

44–45; Docket # 91, Ex. K). As to peak levels, NIOSH and ACGIH have ceiling limits of 200 ppm. (Docket # 91, Ex. K and Ex. E, at 8). While the EPA sets exposure standards for the general population designed to protect people over a 24–hour, seven-day a week period of time, the OSHA, NIOSH, and ACGIH standards all relate to workplace exposure. (Hearing Tr. II at 71). The World Health Organization has stated that fetuses and pregnant women are considered susceptible to CO exposure and that their exposure should be limited to 9 ppm. (Hearing Tr. II at 61–62).

5. Aon Industrial Hygiene Consulting Services conducted the air quality studies Cleveland Hopkins on 11/2/2000, 11/8/2000, 11/9/2000, 11/15/2000, 11/16/2000, 12/5/2000, 12/6/2000, 12/7/2000, and 1/22/2001. (Fechter Aff. at ¶ 13; Docket # 91, Ex. E).

6. Though measurements were conducted on nine employees, only one had a peak exposure above the ACGIH ceiling of 200 ppm. (Hearing Tr. at 52).

28.16 ppm and peak levels ranging from 118 to 380 ppm. (Fechter Aff. at ¶ 15).

After summarizing and explaining the various test results, Dr. Nowicki essentially offers four different opinions:

a. *Continental's air quality studies reveal that workers are exposed to CO exceeding TWA and peak levels prescribed by government agencies.*

■ In his expert report and testimony, Dr. Nowicki asserted that CO monitoring of CSA employees at Continental revealed one CO value which exceeded ACGIH's recommended TWA of 25 ppm and multiple CO instantaneous measurements above the recommended ceiling. (Docket # 91, Ex. E; Hearing Tr. at 52). Here the utility of Dr. Nowicki's proffered testimony is not so much the content of his opinion as he is essentially reporting an objective fact that is not contested, but rather his ability to assist the jury in understanding and interpreting CO exposure numbers obtained by the "agreed protocol" and Continental's own tests as well as the purpose and effect of governmental air quality standards. (Docket # 91, Ex. E; Hearing Tr. at 47–48). The CO measurements were obtained by reliable tests based on methodologies generally accepted in the scientific community. Accordingly, Dr. Nowicki's testimony is admissible to the extent that it is based on summarizing, explaining, and interpreting the CO exposure testing results.

■ However, as conceded by Dr. Nowicki, because the tests rendered so few measurements, there is insufficient data upon which to conduct a statistical analysis or reach reliable conclusions on probable CO exposure. (Hearing Tr. at 52 and 62). Thus, Dr. Nowicki may not proffer testimony on the probability that a given CSA employee would have TWA or peak CO exposure levels which exceed recommended levels.

b. *Ms. Asad's CO exposure was between 50 and 100 ppm.*

■ Based on the results from the CO air quality studies, his site visit to Cleveland Hopkins in October 2001, and Ms. Asad's deposition testimony, Dr. Nowicki made an "educated guess" that Ms. Asad could have been exposed to CO levels between 50 and 100 ppm. (Hearing Tr. at 64). While Dr. Nowicki offers such an opinion, he admits that he does not know Darlene Asad's level of exposure at Cleveland Hopkins in 1997, and that his opinion about her exposure level is not scientifically-based. (Hearing Tr. at 49–50 and 70). In addition, while he testified that his opinion rested largely on Ms. Asad's alleged symptoms, he simultaneously admitted that determining whether Ms. Asad's expressed symptoms were consistent with exposure to CO was outside his area of expertise. (Hearing Tr. at 64 and 68). Given that Dr. Nowicki's opinion, in this area, is not scientifically reliable, he may not testify to it at trial.

c. *Ms. Asad's CO exposure in 1997 was higher than the exposure levels measured in air quality studies in 2000 and 2002.*

■ With respect to Darlene Asad's CO exposure level in 1997, Dr. Nowicki also opines that her exposure level at that time was higher than those levels measured by both parties in their more recent air quality studies. Dr. Nowicki bases his opinion on the following differences between Ms. Asad's working conditions in 1997 and the working conditions of employees tested in 2002: [7]

---

7. Dr. Nowicki testified that, during his site visit on 17 October 2001, he observed an area at Cleveland Hopkins that was "truly repre-sentative" of Ms. Asad's working conditions as it had diesel burning airplanes and APUs.

• *Greater airplane density:* In 1997, at the Midfield Area where Ms. Asad worked, there were approximately 30 parking spots for airplanes, there were approximately ten diesel burning airplanes leaving per hour, and many of these airplanes were often left running. (Hearing Tr. at 49 and 57). In 2002, there was a lower airplane density in the tested working areas. (Hearing Tr. at 49 and 57).[8]

• *Different types of airplanes:* In 1997, Ms. Asad worked around diesel airplanes which were much larger and burned a dirtier, heavier fuel. (Hearing Tr. at 48, 54, and 57). In 2002, most of the airplanes were small, regional jets burning a cleaner fuel. (Hearing Tr. at 49, 54, and 57–8).

• *Auxiliary Power Units ("APUs"):* In 1997, APUs were used to keep power on the airplanes and the APUs were constantly kept running. (Hearing Tr. at 56 and 60). In 2002, APUs had been replaced by electrical plugs which were cleaner in terms of CO emissions. (Hearing Tr. at 60).[9]

• *Longer exposure:* There was no break area or indoor facility near where Ms. Asad worked in 1997, and, since one needed to take a bus to get to a breakroom, the employees generally spent their entire shift around the airplanes. (Hearing Tr. at 49 and 57). In 2002, the workers were located closer to the terminal and spent 30 to 50 percent of their time inside the building where there was no carbon monoxide. (Hearing Tr. at 49 and 57). Thus, the workers were most consistently exposed to CO emissions in 1997. (Hearing Tr. at 57–58).

Dr. Nowicki also suggests that the higher CO exposure levels in 2000 as compared to 2002 is consistent with his opinion that changes in technology, pollution, and working conditions have led to a decrease in CO exposure over time. (Hearing Tr. at 58).

Continental argues that Dr. Nowicki is not qualified to render this opinion because he is not an expert in jet engines or airport design. (Nowicki Dep. Tr. at 61; Hearing Tr. at 43). While that may be true, Dr. Nowicki is an environmental testing expert who has conducted environmental, regulatory risk, and toxicology assessments of work-place environments and has provided industrial hygiene services. (Docket # 91, Ex. F). Moreover, he has developed courses and professional manuals to assist laboratories and other professionals comply with OSHA and EPA regulations and has taught a short course entitled "Toxicology for Non–Toxicologist." (Docket # 91, Exs. E and F). Based on Dr. Nowicki's education and experience, he is qualified to testify to changes in environmental conditions and their effect on workplace CO exposure.

(Hearing Tr. at 48). When he conducted his testing, these diesel burning airplanes had been moved to Houston. (Hearing Tr. at 48). Plaintiff's requests to conduct testing at a more representative site were allegedly denied by defendants. (Hearing Tr. at 48–9; Docket # 91, Ex. E).

8. While Dr. Nowicki does not have independent knowledge of Continental's flight schedule in 1997 or how many airplanes were parked and left running at the Midfield area at a time, he reasonably bases his conclusions on higher density on Ms. Asad's testimony. (Hearing Tr. at 68–69).

9. The agreed testing protocol provided for the use of bellow pumps which were to be used in conjunction with CO testing near the APUs. While APUs were still at Cleveland Hopkins when Dr. Nowicki conducted his site visit, none remained by the time he conducted his tests and so these pumps were not used. (Docket # 91, Ex. E, at 2; Hearing Tr. at 56). As a result, Dr. Nowicki never tested an APU for CO emissions.

*d. CO exposure in 1997 was higher in Ms. Asad's work-area than in the surrounding area.*

Dr. Nowicki testified that he had a "very high level of scientific certainty" that the CO level in which Ms. Asad worked was in excess of ambient air CO levels outside that area. (Hearing Tr. at 67). As a fairly uncontroversial proposition consistent with Dr. Nowicki's 2002 test results, this opinion is sufficiently reliable. While it does not serve to prove Ms. Asad's actual CO exposure, it is relevant circumstantial evidence which helps to provide the jury with a deeper understanding of CO emissions and exposure. Thus, Dr. Nowicki's opinion on this issue is admissible.

### 2. *Dr. Max Wiznitzer*

Dr. Max Wiznitzer is a pediatric neurologist currently employed at Rainbow Babies and Children's Hospital in Cleveland, Ohio. (Docket # 91, Ex. B). He has served as the Chief of the Division of Pediatric Neurology at Rainbow Babies and Children's Hospital and as an assistant professor of pediatrics and neurology at Case Western Reserve University. (Docket # 91, Ex. B). He is board certified by the American Board of Pediatrics, the American Board of Psychiatry and Neurology, with special qualification in child neurology, and the National Board of Medical Examiners. (Docket # 91, Ex. B).[10]

Dr. Wiznitzer conducted a differential diagnosis in an attempt to ascertain the cause of Richard Asad's cerebral palsy. (Hearing Tr. at 39–40). In reaching his conclusions, Dr. Wiznitzer examined Richard Asad's medical records, including the results of three head ultrasounds conducted on Richard Asad on 8 August 1997 (three days after birth), 14 August 1997, and 27 August 1997.[11] (Hearing Tr. at 14–15 and 39–40). In the course of his analysis, Dr. Wiznitzer considered and ruled out birth trauma, genetic predisposition, hypoglycemia, and prematurity as causes of Richard's Asad's injuries.[12] (Hearing Tr. at 6–7 and 18–19). While Dr. Witznitzer noted that chorioamnionitis[13] is a possible cause of cerebral palsy, he felt that chorioamnionitis, in and of itself, was unlikely to have caused the cerebral palsy in this case.[14] (Hearing Tr. at 7 and 30). Dr.

---

**10.** Defendant admits that Dr. Wiznitzer is a well-qualified pediatric neurologist. (Docket # 102, at 24).

**11.** Dr. Wiznitzer did not examine Ms. Asad's prenatal records but explained that he did not need these records to formulate his opinions in this case. (Hearing Tr. at 28).

**12.** While Dr. Wiznitzer did not have an opinion to a probability why Richard was born premature, he explained that prematurity and low birth weight do not cause cerebral palsy but rather are just associated with it. (Hearing Tr. at 10, 12, and 36). A premature baby's brain is at greater risk for damage than a term baby. (Hearing Tr. at 23). Moreover, the part of the baby's brain most sensitive to insult depends on gestational age. (Hearing Tr. at 23). The portion of Richard Asad's brain injured in this case was most sensitive to injury between 30 to 32 weeks, the time frame during which Dr. Wiznitzer testified that the injury allegedly occurred. (Hearing Tr. at 22).

**13.** Chorioamnionitis is "an inflammation of the lining ... that goes around the corneum and the amnion." (Hearing Tr. at 24). In this case, Dr. Wiznitzer suggests that the chorioamnionitis was due to some sort of infectious origin, perhaps Group B streptococcus. (Hearing Tr. at 24–25).

**14.** In reaching this conclusion, Dr. Wiznitzer was relying an articles which suggest that up to seven times as many children who are exposed to choriomnionitis do not develop any problems from it. (Hearing Tr. at 31). Defendant's expert, Dr. Enlow, agrees that six out of seven premature babies, who are exposed to chorioamnionitis, are born normal, without PVL. (Hearing Tr. at 82).

Wiznitzer testified that there is "a definite relationship between the presence of chorioamnionitis and a risk for cerebral palsy, specifically, periventricular leukomalacia in the pre-term child."[15] (Hearing Tr. at 25–26). However, because a majority of premature babies whose mothers have chorioamnionitis do not develop cerebral palsy, he explained that it is important to look for additional factors and that the baby is at a much greater risk for permanent injury when the chorioamnionitis coincides with another event, such as something that causes inadequate oxygen delivery. (Hearing Tr. at 26–27).

Dr. Wiznitzer specifically concluded, to a reasonable degree of medical probability, that an "insult to [Richard Asad's] white matter," occurring some time in the two weeks prior to his birth, led to or was a significant contributing factor to Richard's PVL and cerebral palsy. (Hearing Tr. at 7–9 and 13).[16] The nature of the event causing the insult was "something that basically irreversibly injured those myelin-producing cells, called oligodendrocytes." (Hearing Tr. at 30). Without opining on the specific level of exposure necessary to cause such an injury, Dr. Wiznitzer did testify that excessive carbon monoxide exposure to the mother could cause the insult he was describing. (Hearing Tr. at 32–33).

■ Differential diagnosis, the methodology employed by Dr. Wiznitzer, and many of the other experts, in developing their opinions in this case is a generally accepted scientific technique. *Hardyman v. Norfolk & Western Railway Company*, 243 F.3d 255, 260 (6th Cir.2001); *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir.2003). A reliable differential diagnosis is generally accomplished by "determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Hardyman*, 243 F.3d at 260–61. It is essentially a "process of elimination." *Id.* at 262. In this case, Dr. Wiznitzer correctly utilized this methodology by identifying the possible causes of Richard's cerebral palsy, ruling out most of these causes, determining that chorioamnionitis was unlikely to have cause the injury by itself, identifying the type of event which led to or substantially contributed to Richard's cerebral palsy, and ascertaining the timeframe within which that event occurred. While defendant objects that Dr. Wiznitzer offered no explanation for eliminating prematurity and chorioamnionitis as the cause of Richard's cerebral palsy, (Docket #102, at 26), Dr. Wiznitzer did offer reasoned explanations at the *Daubert* hearing for excluding those two factors as the sole cause of Richard's injuries. Accordingly, plaintiff may introduce Dr. Wiznitzer's expert testimony at trial.

**15.** The increased risk is actually higher in the term child. (Hearing Tr. at 25). Moreover, an article cited by Dr. Brautbar, suggests that the association of chorioamnionitis and cerebral palsy in pre-term infants is equivocal. (Hearing Tr. II at 38 and 48–49).

**16.** Dr. Wiznitzer reached his conclusion about the timing of the insult on the fact that "holes," areas of permanent damage to the brain, generally develop one to four weeks after the actual insult occurs. (Hearing Tr. at 15–16). In this case, the "holes" were not apparent until Richard's 27 August ultrasound. (Hearing Tr. at 15–16). Since no ultrasounds were conducted between 15 August and 27 August, he went back four weeks from those dates to develop a window during which the injury occurred. (Hearing Tr. at 16). Moreover, because the ultrasound taken three days after Richard's birth showed an area of damage and because that kind of insult requires some time to develop, he excluded any period of time after 6 or 7 August 1999. (Hearing Tr. at 16–17). Thus, the remaining time period during which the injury could have occurred was the week or two prior to Richard's birth. (Hearing Tr. at 16).

### 3. Dr. Nachman Brautbar

Dr. Nachman Brautbar is a medical doctor practicing in internal medicine, nephrology, and toxicology with areas of expertise which include toxicology and chemical exposure.[17] (Hearing Tr. II at 17, Pls. Exh. T). He is currently a clinical professor of medicine at U.S.C. and had previously been a tenured associate professor of medicine and pharmocology at U.S.C. from 1982 through 1988. (Hearing Tr. II at 17, Ex. T).[18] Dr. Brautbar is also a member of the Society of Toxicology, Southern California chapter and Neurotoxicology Specialty Section, the American College of Toxicology, and the British Toxicology Society. (Hearing Tr. II at 20–21, Ex. T). In 2000, Dr. Brautbar was asked to review a chapter on toxicology in a reference manual on scientific evidence for federal judges. (Hearing Tr. II at 19, Ex. T at 6). During the last 27 or 28 years of his practice, Dr. Brautbar has been treating, diagnosing, and evaluating patients with occupational diseases, such as exposure to toxic chemicals including carbon monoxide. (Hearing Tr. II at 18–19). With respect to a pregnant woman's exposure to carbon monoxide and whether the child suffered from *in utero* carbon monoxide exposure, Dr. Brautbar has consulted with or treated only one or two such patients. (Hearing Tr. II at 29). Dr. Brautbar is not, however, board certified in obstetrics and gynecology, pediatrics, pediatric neurology, radiology, or as a physician in toxicology. (Hearing Tr. II at 25–27).

In reaching his conclusions in this case, Dr. Brautbar engaged in a differential diagnosis. (Hearing Tr. II at 22). After considering Ms. Asad's workplace setting, the symptoms she presented with, such as dizziness and nausea, and Dr. Nowicki's expert report, Dr. Brautbar ruled out other causes of Ms. Asad's symptoms,[19] determined that carbon monoxide exposure was the most likely cause, and then extrapolated from Ms. Asad's symptoms to a level of exposure. (Hearing Tr. II at 23–24, 35 and 56).[20] While not really addressed in his expert report, Dr. Brautbar also made clear, at the *Daubert* hearing, that he relied on Dr. Wiznitzer's differential diagnosis as to the nature and timing of the injurious event. (Hearing Tr. II at 35–37).[21] Relying on published scientific liter-

---

**17.** While Dr. Brautbar was not permitted to testify as an expert in approximately five cases, some of those cases excluded only portions of his testimony, none of the cases involve carbon monoxide toxicity and none addressed his qualifications directly. (Hearing Tr. II at 42). On the other hand, Dr. Brautbar has been recognized by state and federal courts as qualified to express toxicology opinions in approximately 52 cases. (Hearing Tr. II at 42).

**18.** Dr. Brautbar has not had a faculty appointment in pharmocology or toxicology since 1988 though he has been frequently invited to teach toxicology at medical schools as a visiting professor. (Hearing Tr. II at 28–29, Ex. T).

**19.** While Dr. Brautbar noted that the most common differential diagnosis for CO induced dizziness is ongoing flu symptoms, he stated that there is nothing in the record to support that conclusion in this case. (Hearing Tr. II at 55).

**20.** In forming his opinions, Dr. Brautbar reviewed Ms. Asad's prenatal records, Richard Asad's medical records, Ms. Asad's deposition, and the environmental studies conducted by Continental and Dr. Nowicki (Docket # 91, Exs. C and D; Hearing Tr. II at 24).

**21.** In addition to Dr. Wiznitzer's report, Dr. Brautbar relied on *Chorioamnionitis and Brain Injury,* 29 CLINICS IN PERINATOLOGY 603–21 (2002) to rule out chorioamnionitis as a likely cause of Richard's cerebral palsy. (Hearing Tr. II at 48–9). On page 615, the article concludes that the "association of chorioamnionitis with depressed Apgar scores or neonatal seizures and with [cerebral palsy] is equivocal in the preterm infant."

ature, Dr. Brautbar opined that dizziness arises in patients with about 20 percent carboxyhemoglobin which translates to a CO exposure level of between 50 and 150 ppm. (Hearing Tr. II at 24 and 44–48). In his expert report, Dr. Brautbar also stated that it was his opinion with reasonable medical probability that "Darlene Asad's described carbon monoxide exposure was a substantial factor in the development of cerebral palsy in Richard Asad." (Docket # 91, Ex. D, at 2–3).

The toxicology literature that Dr. Brautbar relied on to extrapolate from symptoms to levels of carbon monoxide exposure include *Carbon Monoxide Poisoning, a Review for Clinicians,* 17 J. EMERGENCY MED. 87–93 (1999) (hereinafter "Carbon Monoxide Poisoning"), *Moderate Prenatal Carbon Monoxide Exposure Produces Persistent and Apparently Permanent Memory Deficiency in Rats,* 31 TERATOLOGY 1–12 (1985) (hereinafter "Moderate Prenatal CO"),[22] and a recent OSHA publication.[23] (Hearing Tr. II at 44–47). In particular, he relies on Table 2 from the "Carbon Monoxide Poisoning" article to link specific symptoms with specific carboxyhemoglobin levels and the "Moderate Prenatal CO" article and the OSHA publication to connect carboxyhemoglobin levels with levels of carbon monoxide exposure. (Hearing Tr. II at 46–47). Specifically, Table 2 of "Carbon Monoxide Poisoning" relates carboxyhemoglobin levels of 20 percent to symptoms of dizziness, nausea, and dyspnea or shortness of breath and states that as "carboxyhemoglobin increases above 20 percent, the patient may develop headache, dizziness, confusion, and nausea." (Hearing Tr. II at 50).

Both parties' toxicology experts admit that there are no studies on humans as to minimum CO dose levels. (Hearing Tr. II at 58 and 93). For obvious ethical reasons, no studies on the effects of CO exposure have been conducted on pregnant women. However, Dr. Brautbar did rely on two articles which address that issue. Lawrence D. Longo, *The Biological Effects of Carbon Monoxide on the Pregnant Woman, Fetus, and Newborn Infant,* 129 AM. J. OBSTETRICS AND GYNECOLOGY 69–103 (1977) (hereinafter "Biological Effects of CO"); Gideon Koren, et al., *A Multicenter, Prospective Study of Fetal Outcome Following Accidental Carbon Monoxide Poisoning in Pregnancy,* 5 REPRODUCTIVE TOXICOLOGY 397–403 (1991) (hereinafter "Accidental CO Poisoning"). In "Biological Effects of CO" at page 96, the author concluded that fetal carboxyhemoglobin concentration exceeded maternal concentrations by 10 to 15 percent, that CO uptake and elimination occur relatively more slowly in the fetus than the mother, and that the "pregnant woman probably is more sensitive to the effects of carbon monoxide."

In assessing Dr. Brautbar's expert testimony, this Court will consider his two primary opinions separately:

*a) Ms. Asad's CO exposure level.*

██ Relying on, among other things, Ms. Asad's deposition testimony regarding her symptoms, Dr. Nowicki and Continental's environmental testing reports, and the available toxicology literature, Dr. Brautbar opines that Ms. Asad was exposed to CO levels somewhere between 50 and 150 ppm. Dr. Brautbar's methodology

---

**22.** In this study, rats were exposed to CO levels of 150 ppm 24 hours a day for their entire gestational period of 21 days. (Hearing Tr. II at 51–52).

**23.** The OSHA study involved the administration of carbon monoxide to human volunteers and determined that CO exposure of about 50 ppm for two hours caused an elevation of carboxyhemoglobin to about 27 percent. (Hearing Tr. II at 47 and 52–53).

of extrapolating from symptoms to levels of exposure is specifically recognized in the Textbook of Toxicology (Hearing Tr. II at 57), and, when done properly, is scientifically reliable.[24] *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting that "[t]rained experts commonly extrapolate from existing data"). Defendant does not object to this methodology but rather suggests that Dr. Brautbar lacks a sufficient factual basis regarding Ms. Asad's symptoms to draw his conclusions. This objection essentially goes to Dr. Brautbar's assessment of Ms. Asad's symptoms and the credibility of her deposition testimony. Because Dr. Brautbar's evaluation of Ms. Asad's testimony is reasonable, because he reliably extrapolates from her symptomology to her exposure level based on the toxicology literature, and because his opinion on CO exposure would be helpful to the jury, he may offer his opinion on Ms. Asad's range of CO exposure.

### b) *Cause of Richard Asad's cerebral palsy.*

 Relying on Dr. Wiznitzer's expert report and his own differential diagnosis, Dr. Brautbar opines that Ms. Asad's exposure to CO was a "substantial factor" in the development of cerebral palsy in Richard Asad. (Docket # 91, Ex. D, at 2–3). Notwithstanding defendant's objections, a medical expert is not precluded from testifying as to causation simply because he lacks precise details on the plaintiff's exposure or specific information concerning the exposure necessary to cause specific harm to humans or fetuses. *Hardyman,* 243 F.3d at 265–66 (quoting *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 264 (4th Cir.1999)). However, the expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions or if based on assumed facts, there must be some basis for the assumptions in the record. *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir.2000). In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury. *Jahn v. Equine Services, PSC,* 233 F.3d 382, 390 (6th Cir.2000). The fact that several possible causes might remain "uneliminated" goes to the accuracy of the conclusion and not to the soundness of the methodology. *Id.* Similarly, weaknesses in the factual basis of an expert witness' opinion "bear on the weight of the evidence rather than on its admissibility." *McLean,* 224 F.3d at 801.

Defendant argues that Dr. Brautbar is not qualified to offer an expert opinion on causation in this case and that his methodology is unreliable. While it is true that Dr. Brautbar is not independently qualified to exclude the possible causes of Richard Asad's cerebral palsy because he is not board certified in obstetrics and gynecology, pediatrics, pediatric neurology or radiology and does not practice in any of these areas, he properly relied on Dr. Wiznitzer's expert opinion in expressing his own opinion on causation. (Hearing Tr. II at 35–37; Brautbar Dep. at 72). Rule 703 of the Federal Rules of Evidence specifically allows experts, in reaching their opinions, to rely on "facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions." Under Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts. *Barris v. Bob's Drag Chutes & Safety Equipment, Inc.,* 685 F.2d 94, 102 n. 10 (3rd Cir.1982). Dr. Wiznitzer's differential

---

**24.** Defendant's experts, Dr. Enlow and Dr. Fechter, recognize this approach as both common and scientifically valid. (Hearing Tr. at 86 and Hearing Tr. II at 100).

diagnosis was that an insult to Richard Asad's white matter, occurring some time in the two weeks prior to his birth, led to or was a significant contributing factor to Richard's PVL and cerebral palsy. Based on Dr. Wiznitzer's diagnosis of the nature and timing of the injurious event and his own conclusions regarding Ms. Asad's level of CO exposure, Dr. Brautbar concluded that the CO exposure was a "substantial factor" in the cause of Richard's PVL and cerebral palsy. Defendant's objections to Dr. Brautbar's methodology mirror their objections to Dr. Wiznitzer's differential diagnosis which have already been addressed. Thus, Dr. Brautbar's methodology is sound.

Moreover, Dr. Brautbar is qualified to render his opinion on causation. Dr. Brautbar's limited exposure to *in utero* CO exposure, having only treated one or two pregnant women whose fetuses had been exposed to CO *in utero* during his lengthy career of treating and consulting on occupational injuries involving exposure to toxic chemicals, does not preclude him from testifying as an expert on causation in this case. As testified by defendant's expert Dr. O'Shaughnessy, there are no experts with substantial experience in dealing with pregnant women exposed to CO. (Hearing Tr. at 116–17). The causation issue in this case is complex and can only be adequately addressed by a combination of expertise in such fields as pediatric neurology and toxicology. Utilizing Dr. Wiznitzer's opinion and his own expertise in toxicology and occupational injuries, Dr. Brautbar is qualified to render an opinion on the cause of Richard Asad's PVL and cerebral palsy; it is noteworthy that his opinion is consistent with Dr. Wiznitzer's testimony that excessive CO exposure to the mother could cause the particular insult to Richard's brain.

### B. Defendant's expert witnesses

#### 1. *Dr. Thomas Enlow*

██ Dr. Enlow is a pediatric neurologist who is board certified in neurology with special competence in child neurology and with added qualification in clinical neurophysiology. (Hearing Tr. at 76, Enlow Aff. at ¶¶ 1–2).

Dr. Enlow conducted a differential diagnosis in developing his opinions.[25] (Hearing Tr. at 95–98). He reviewed Ms. Asad's prenatal and labor delivery records, Richard Asad's birth, hospitalization, and outpatient records, Ms. Asad's deposition, all of the expert reports except Dr. Nowicki's, numerous expert depositions, and medical literature. (Enlow Aff. at ¶¶ 5–6). Dr. Enlow's opinions, to a high degree of medical probability, are that Richard's cerebral palsy and cognitive impairments are the result of his PVL and that chorioamnionitis, premature labor and birth, the maternal and infant infection, and hypoglycemia are likely factors that worsened the degree of injury to his brain.[26] (Hearing Tr. at 79–80, Enlow Aff. at ¶ 16). Dr. Enlow suggests that it is impossible to determine the relative impact of those factors, but that all of them are "pertinent and germane" to Richard Asad's injuries. (Hearing Tr. at 80). Considering the evolution of Richard's injuries illustrated by the three ultrasound images of his brain, Dr. Enlow suggests that the injury must have occurred close to the time of birth, "within

**25.** Like Dr. Wiznitzer, Dr. Enlow ruled out birth trauma and genetic predisposition as possible causes of Richard Asad's cerebral palsy. (Hearing Tr. at 94).

**26.** While there was a great deal of discussion in Dr. Enlow's expert report and at the hearing about Group B strep, Dr. Enlow admits that it does not specifically cause PVL but rather is another factor which may enhance the injury to the brain in combination with other factors. (Enlow Dep. at 27).

up to the late part of July." (Hearing Tr. at 83–85 and 91, Enlow Aff. at ¶ 15).

Dr. Enlow admits that *in utero* exposure to sufficient amounts of CO can cause cerebral palsy but concludes that CO exposure is not the most likely cause of Richard's PVL or cerebral palsy. (Hearing Tr. at 79 and 85). Given the presence of three risk factors for neuronal injury -hypoglycemia, prematurity, and chorioamnionitis— he finds it unlikely that CO exposure played a role in Richard's injury. (Docket # 87, Ex. 2B; Hearing Tr. at 96–98).[27] Moreover, because there is no information that Ms. Asad sought medical care for CO exposure-related symptoms or even complained of dizziness, headaches, or nausea at the time, he does not believe she was exposed to an "excessive amount [or] toxic amount of carbon monoxide." (Hearing Tr. at 86–7).[28] Dr. Enlow also relied on Dr. Fechter's expert report in reaching his conclusion that CO exposure likely played no role in Richard Asad's injuries. (Hearing Tr. at 99).

Plaintiffs object to Dr. Enlow's opinions arguing that "he dismisses out of hand the role that carbon monoxide plays in cerebral palsy," that Dr. Enlow was unable to present any medical literature to support his suggested connection between hypoglycemia, Group B strep, and cerebral palsy, and that Dr. Enlow's testimony that the "PVL was caused by a confluence of factors is unsupported by the medical literature." (Docket # 103, at 6–7). Contrary to plaintiffs' objections, Dr. Enlow did not dismiss the role of CO monoxide out of hand but rather dismissed it based on his reasoned examination of the available evidence. In their objections, plaintiffs misread Dr. Enlow's testimony. He does not suggest that Group B strep or hypoglycemia caused Richard's PVL but rather that they are factors which worsened the injury to his brain. Dr. Enlow specifically testified that it is impossible to determine the exact role that the various factors played either in causing or enhancing Richard's injuries and does not directly opine on the specific cause of Richard's PVL.

Dr. Enlow is qualified to render his opinions in this case, and his opinions are based on a reliable foundation and have been developed using a scientifically accepted methodology. Accordingly, plaintiffs' objections are misplaced and Dr. Enlow may testify.

### 2. *Dr. Richard O'Shaughnessy*

 Dr. Richard O'Shaughnessy is a board certified obstetrician and gynecologist licensed to practice medicine in the State of Ohio. (Hearing Tr. at 107; O'Shaughnessy Aff. at ¶ 2). Widely published in the field of obstetrics and gynecology, Dr. O'Shaughnessy is currently a professor at The Ohio State University College of Medicine, Department of Obstetrics and Gynecology and the Depart-

---

**27.** Dr. Enlow explained his rationale at the hearing:

> Now if this child had no other risk factors, then I think medical probability, you have to start looking at these rare things, but what they are asking me is to ignore the five obvious things in preference to this one that is very rare. It is not mentioned much in the literature.
>
> * * * * * *
>
> So in the absence of all of these other things, then yeah, I would have to start looking at did [CO exposure] play a role,

> but in the presence of all of these ... I'm looking at 65, 75, 85 percent likely that one or more of these five things that this child and mom had caused his ultimate problems, not this one way out here.

(Hearing Tr. at 97).

**28.** Dr. Enlow admitted, however, that if Ms. Asad was in fact exposed to higher levels of CO in her workplace in the month before her delivery that he would certainly put CO exposure on the list as part of his differential diagnosis. (Hearing Tr. at 99).

ment's director of the Fetal Treatment Program. (O'Shaughnessy Aff. at ¶ 1). Approximately, 90 percent of his time is spent in the clinical practice of obstetrics and high risk obstetrics.

Dr. O'Shaughnessy's opinion, to a reasonable degree of medical probability, is that Richard Asad's cerebral palsy was not caused by CO intoxication but rather was caused by premature birth complicated by infection. (O'Shaughnessy Aff. at ¶¶ 15–16; Docket # 87, Ex. 1B).[29] Dr. O'Shaughnessy also asserts that in order for a fetus to be endangered from CO intoxication, "the mother must be very sick from the CO exposure such that her life is threatened by the CO." (O'Shaughnessy Aff. at ¶ 14). Because there is no objective medical evidence or complaints of symptoms related to CO exposure during Ms. Asad's pregnancy, Dr. O'Shaughnessy concluded that CO exposure had no impact on Richard's injuries. (Docket # 87, Ex. 1B).

■ Plaintiffs do not object to Dr. O'Shaughnessy's opinions based on his interpretation of the medical records (Docket # 103, at 3), but argue that he is not qualified to offer the opinion that carbon monoxide played no conceivable role in Richard Asad's injuries. As with Dr. Enlow, the Court finds Dr. O'Shaughnessy is qualified to exclude CO exposure as the likely cause of Richard's cerebral palsy and that his opinion is reliable and methodologically sound.[30] However, Dr.

O'Shaughnessy deviates from his qualifications in his testimony about the levels of CO intoxication which are injurious to a fetus. As Dr. O'Shaughnessy readily admits, he is not a toxicology expert (O'Shaughnessy Dep. at 11–13) and he has had little exposure to cases of maternal CO intoxication (Hearing Tr. at 113). Accordingly, he is not qualified to opine on the symptoms a pregnant mother will present if she is exposed to CO levels which could be injurious to a fetus. Thus, while he may exclude CO intoxication from his differential diagnosis based on the medical evidence and other expert reports, he is not qualified to testify specifically on CO exposure levels as they relate to maternal symptoms and fetal injuries.

### 3. *Dr. Charles Lanzieri*

■ Dr. Charles Lanzieri is Director of Neuroradiology at University Hospitals in Cleveland, Ohio and is a professor of Neuroradiology at Case Western Reserve University School of Medicine. (Hearing Tr. II at 3; Lanzieri Aff. at ¶ 1). Dr. Lanzieri has experience reviewing and interpreting head imaging of all types, including for PVL, and approximately 25 percent of his practice is pediatric. (Lanzieri Aff. at ¶¶ 4–6).

Dr. Lanzieri reviewed Richard Asad's medical records, including the three ultrasounds taken of his brain in August 1997 and the MRI taken in June 1998.[31] (Lan-

29. In reaching his conclusions, Dr. O'Shaughnessy reviewed Ms. Asad's deposition, Darlene and Richard Asad's medical records, all expert reports except Dr. Nowicki's, numerous expert depositions, and medical literature.

30. Plaintiffs complain that Dr. O'Shaughnessy's "sole basis for concluding that there is no evidence of intoxication is his own factual determination as to the credibility of Darlene Asad's testimony at her deposition." (Docket # 103, at 4). Like Dr. Enlow, Dr. O'Shaughnessy is not really making credibility determi-

nations but rather assessing the symptoms reported by Ms. Asad in light of the medical evidence available during her pregnancy. After considering all the evidence, both have concluded that there is little or no evidence of maternal intoxication. In reaching their conclusion, the doctors utilize a reliable methodology and analysis.

31. After issuing his expert report, Dr. Lanzieri also reviewed all the expert reports and depositions except for Dr. Nowicki's. (Lanzieri Aff. at ¶ 10).

zieri Aff. at ¶ 8; Hearing Tr. II at 4). Based on the evolution of the PVL and the progression of the accompanying mass effect in Richard's brain illustrated by the head ultrasounds, Dr. Lanzieri concluded that the injury to Richard's brain occurred within 72 hours of the first ultrasound, which was taken on 8 August 1997, implying an injury in the perinatal period. (Lanzieri Aff. at ¶ 16; Hearing Tr. II at 4–5). As Dr. Lanzieri makes evident, his expertise relates to the timing of the brain injury and does not encompass chorioamnionitis relationship to cerebral palsy or the actual effects of CO on fetal brain development.[32] (Hearing Tr. II at 6, 9–10, and 16).

Plaintiff does not seek to exclude any testimony by Dr. Lanzieri (Docket # 103, at 9), and this Court's independent assessment of his opinions and their factual basis as well as his methodology demonstrates that they are both reliable and relevant. Thus, Dr. Lanzieri may testify to his opinions at trial.

### 4. *Dr. Lawrence Fechter*

■ Dr. Lawrence Fechter has a Ph.D. in neuroscience and biopsychology. (Hearing Tr. II at 65; Fechter Aff. at ¶ 2). Having done a research fellowship in toxicology, Dr. Fechter taught toxicology for approximately 21 years at Johns Hopkins University and the University of Oklahoma. (Hearing Tr. II at 66; Fechter Aff. at ¶ 2). Currently, Dr. Fechter is a research scientist in the area of toxicology at the Veterans Hospital in Loma Linda, California. (Hearing Tr. II at 66; Fechter Aff. at ¶ 2). In addition to publishing numerous articles on toxicology and being a member of professional organizations involving toxicology, Dr. Fechter twice served on a review panel to the EPA which was considering setting standards for CO exposure and authored a part of a chapter on the "Effects of CO on Health Relating to the Fetus" for the EPA. (Hearing Tr. II at 66–7; Fechter Aff. at ¶ 3). Dr. Fechter has also performed laboratory studies involving the exposure of animals, including pregnant female animals, to CO.[33] (Hearing Tr. II at 67–8; Fechter Aff. at ¶ 4).

Prior to reaching his opinions in this case, Dr. Fechter reviewed Ms. Asad's deposition, Dr. Wiznitzer and Dr. Brautbar's expert reports, a 1994 NIOSH Health Hazard Evaluation conducted at Newark Airport, an Industrial Hygiene Survey conducted at Cleveland Hopkins in 1995, Continental's 2000 testing conducted at numerous airports, including Cleveland Hopkins, the EPA's air quality studies for runway expansion at Cleveland Hopkins, Dr. Nowicki's expert report, and scientific literature in the field of CO exposure.[34] (Hearing Tr. II at 70; Fechter Aff. at ¶ 8). Like plaintiffs' expert Dr. Brautbar, Dr. Fecht-

---

**32.** Dr. Lanzieri admits that he really does not know what CO does and that he has no opinion as to the role of CO in the insult or injury in this case. (Hearing Tr. II at 10).

**33.** Dr. Fechter's last study on CO exposure in pregnant animals was conducted in the early 1980's. (Hearing Tr. II at 79–80). In that study, he exposed pregnant rats to CO 24 hours a day for their entire gestational period, and the lowest dose that caused brain damage was 150 ppm. (Hearing Tr. II at 80–1). In assessing the usefulness of this study, Dr. Fechter admits that he is not sure whether rats get PVL or cerebral palsy and that his studies did not attempt to correlate CO levels that would cause cerebral palsy. (Hearing Tr. II at 85–6).

**34.** As noted earlier, none of the air quality testing could be conducted in the midfield area under conditions analogous to those Ms. Asad faced during her employment in 1997. (Hearing Tr. II at 106). After issuing his initial expert report, Dr. Fechter also reviewed the depositions of Drs. Wiznitzer and Brautbar and the expert reports of Drs. O'Shaughnessy, Lanzieri, and Enlow and stated that the additional material did not change his opinions. (Fechter Aff. at ¶ 10).

er relied on "Accidental CO Poisoning," a survey conducted on 38 babies of pregnant women accidentally exposed to CO while pregnant. (Docket # 91, Ex. I). In this study, the only baby ultimately diagnosed with cerebral palsy was born from a woman who had a carboxyhemoglobin level of approximately 37.5 percent at the time of CO exposure.[35] (Fechter Aff. at ¶ 25; Docket # 91, Ex. I, at 399; Hearing Tr. II at 99–100). The severity of this woman's symptoms were categorized as Grade 4 and described as "disoriented, depressed sensorium, response to simple commands limited and inappropriate." (Fechter Aff. at ¶ 25; Docket # 91, Ex. I, at 398). Pregnant mothers with less severe CO exposure—Grades 1 and 2—exhibiting symptoms of headaches, dizziness, and nausea, all had babies who had normal development. (Fechter Aff. at ¶ 25; Docket # 91, Ex. I, at 399–400).

Based on the air quality studies and the literature on CO exposure, Dr. Fechter concludes, with a reasonable degree of scientific certainty, that Ms. Asad was exposed to CO within OSHA's limits, suggesting that Ms. Asad's likely CO exposure level gave her a carboxyhemoglobin level of 5 percent or less, and that it is virtually impossible for her CO exposure at Cleveland Hopkins in 1997 to have caused Richard Asad's cerebral palsy. (Hearing Tr. II at 73, 81, and 98; Fechter Aff. at ¶ 30; Docket # 87, Ex. 4B). Dr. Fechter's conclusions are based largely on Ms. Asad's symptoms, which he characterizes as mild, the levels of CO exposure reported by the air quality studies, almost all of which were well below the applicable governmental safety standards, and the outdoor environment in which Ms. Asad was working.[36] (Hearing Tr. II at 73–75 and 100–101). Even if Ms. Asad's complaints of occasional dizziness were related to CO exposure, Dr. Fechter opines that the dose she was likely exposed to would not have been toxic to her fetus. (Hearing Tr. II at 78). In short, he asserts that, for Richard Asad's injuries to be a result of Ms. Asad's CO exposure, one would have to assume a drastically higher exposure than is suggested by the air quality studies. (Hearing Tr. II at 78).

Plaintiff contends that Dr. Fechter's testimony that only extremely high levels of CO may cause cerebral palsy should be stricken as inconsistent with his prior research, the research he relies on in rendering his opinions, and his deposition testimony that the injuries sustained by Richard Asad are consistent with CO exposure. (Docket # 103, at 9). Specifically, plaintiffs points to following excerpt from the "Accidental CO Poisoning" article:

> Recent studies have documented that chronic exposure of pregnant animals to CO levels not associated with measurable maternal toxicity may be associated with developmental delay and permanent CNS [central nervous system] damage.

(Docket # 91, Ex. I, at 400). Plaintiffs also note that Dr. Fechter himself concluded that his research suggests that the effects of CO may result at exposure levels below 150 ppm (Docket # 91, Ex. H, at 19). Notwithstanding plaintiffs' objections, Dr. Fechter's analysis and interpretation of the medical literature is scienti-

---

**35.** The pregnant woman's carboxyhemoglobin was not actually tested until two hours after her exposure and at that point it measured 25 percent. (Docket # 91, Ex. I, at 399). Because an adult gets rid of half of their carboxyhemoglobin level in about four hours, Dr. Fechter testified that her initial level would have been approximately 37.5 percent. (Hearing Tr. at 99–100).

**36.** Dr. Fechter also bases his conclusions, in part, on the absence of any evidence that Ms. Asad's co-workers exhibited symptoms related to CO exposure. (Hearing Tr. at 101).

fically sound and provides a reliable factual basis for his ultimate conclusions. While the "Accidental CO Poisoning" study may include the statement identified by plaintiffs, the results of the study are consistent with Dr. Fechter's testimony. Moreover, neither Dr. Fechter's suggestion that CO exposure may have negative effects on pregnant rats at exposure levels below 150 ppm or his testimony that cerebral palsy may be caused by CO exposure contradicts his conclusion, that CO exposure did not cause Richard Asad's injuries in this case, or renders it unreliable.

Dr. Fechter is well-qualified to express the opinions he renders in this case. As his methodology is sound and his opinions are relevant and factually based, Dr. Fechter may testify at trial.

## IV. CONCLUSION

For the reasons stated above, plaintiffs' experts Dr. Wiznitzer and Dr. Brautbar and defendant's experts Dr. Enlow, Dr. Lanzieri, and Dr. Fechter may testify to all the opinions expressed in their expert reports. The two remaining experts may testify subject to the following limitations:

- Dr. Nowicki (plaintiffs' expert) may not testify on the probability that a given Continental employee, including Darlene Asad, would have TWA or peak CO exposure levels which exceeded recommended levels or testify as to a specific level of CO to which Darlene Asad was exposed.
- Dr. O'Shaughnessy (defendant's expert) may not testify as to the clinical symptoms a pregnant mother will present if she has been exposed to CO at levels injurious to a fetus.

IT IS SO ORDERED.